UNITED STATES *v.* CROSSE & BLACKWELL, INC. (No. 3761)[1]
CROSSE & BLACKWELL, INC. *v.* UNITED STATES (No. 3762)

---

[1] T. D. 47141.

United States Court of Customs and Patent Appeals, May 31, 1934

*Charles D. Lawrence*, Assistant Attorney General (*John F. Kavanagh* and *Ralph Folks*, special attorneys, of counsel), for the United States.
*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for Crosse & Blackwell, Inc.
[Oral argument April 9, 1934, by Mr. Tompkins and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges [2]

GRAHAM, Presiding Judge, delivered the opinion of the court:

Certain immature walnuts, imported at the port of Baltimore in several shipments, packed in barrels or hogsheads, in brine, were classified by the collector in each instance as "walnuts prepared or preserved", under paragraph 760 of the Tariff Act of 1930. The importer protested in each instance, claiming the goods to be dutiable as fruits in brine under paragraph 752, or as edible nuts, pickled or otherwise prepared or preserved, and not specially provided for, under paragraph 761, or as not enumerated manufactured or unmanufactured articles under paragraph 1558 of said act. An amendment to the protest, claiming the goods to be dutiable as vegetables, prepared or preserved, under paragraph 775 of said act, was afterward made. This latter claim, however, was not pressed, and will not be further considered.

The United States Customs Court sustained the protests, holding the goods to be edible nuts, pickled, under said paragraph 761.

Thereupon the Government appealed, alleging error in such decision, and insisting that the collector's classification should be sustained. Thereafter, the importer filed its cross appeal, alleging error in the said decision in not finding that said merchandise consisted of articles raw or unmanufactured, in not finding that they were nonenumerated manufactured or unmanufactured articles, under said paragraph 1558, in not finding that they were fruits in brine, under said paragraph 752, in not making allowance of 50 per centum on account of husks and brine, in holding that the imported materials were nuts, and, finally, in finding that they were edible nuts, pickled.

These cross appeals are now before us. The principal question presented arises from the controversy between the parties as to whether the imported articles are, or are not, walnuts, and further, that even

---

[2] HATFIELD, J., did not participate in this case.

if they be walnuts, whether, by judicial interpretation and administrative practice, they should not be classified under some of the competing provisions of the statute set out in the protest of the importer.

As to the claim for an allowance on account of husks and brine, the trial court has held that the evidence shows an allowance was made for the brine by the customs officials, and that the husk is eaten as a part of the imported articles, and that the importer has not made a case as to this portion of his protest. With that finding we are in harmony.

The material portions of the several paragraphs involved read as follows:

PAR. 752. Fruits in their natural state, or in brine, pickled, dried, desiccated, evaporated, or otherwise prepared or preserved, and not specially provided for, and mixtures of two or more fruits, prepared or preserved, 35 per centum ad valorem * * *.

PAR. 760. Walnuts of all kinds, not shelled, 5 cents per pound; shelled, 15 cents per pound; blanched, roasted, prepared, or preserved, including walnut paste, 15 cents per pound; pecans, unshelled, 5 cents per pound; shelled, 10 cents per pound.

PAR. 761. Edible nuts, not specially provided for, not shelled, 2½ cents per pound; shelled, 5 cents per pound; cashew nuts, shelled or unshelled, 2 cents per pound; any of the foregoing, if blanched, shall be subject to the same rate of duty as if not blanched; pickled, or otherwise prepared or preserved, and not specially provided for, 35 per centum ad valorem * * *.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

In addition to the testimony of three witnesses called by importer and two called by the Government, there are various exhibits in evidence, one of which comprises official samples which were taken from the barrel or hogshead in which imported. Another exhibit represents the articles in a prepared state ready for eating, after being treated in importer's plant, following importation. As we understand it, this latter exhibit shows the condition of the imported articles as they are offered for sale for consumption.

The record establishes the fact that these products are plucked from the walnut trees during about 1 week in the month of June, some 3 months before time for them to become fully developed walnuts. One witness states that they are plucked when about "half way between the blossom state and the finished walnut". At the time of plucking they have not developed to a sufficient degree to render the husk or outer covering of the nut separable from the shell, nor have the kernels of the nut developed to such a degree that they may be separated from the whole. It is testified that one of the chief tests made of the merchandise in buying it is "to run a needle into the blossom end to ascertain no shell has been formed", and that "If any shell has formed, it is rejected", because if it had a shell it would be

unsuitable for importer's purposes. The particular articles here involved were packed in 15 per centum brine and so imported. As imported they were not edible, it being necessary to further process them in order to render them fit for eating.

One of the witnesses describes this additional processing as follows:

Q. Please state fully and in detail, just how this imported merchandise, Exhibit 2, is treated before you sell it to your customers.—A. The barrels are taken to the pickle department, the head is removed and the products are taken out of the brine and placed in wood trays, boxes, or containers. These containers are then placed in a retort or auto-clave and subjected to a steam atmosphere for eight to ten hours, according to the consistency. Following this treatment they are then removed——

Q. Does that change the appearance in any way, the steam treatment?—A. Considerably.

Q. How?—A. When they go in, they are green, when they come out they are black, almost like a brown, reducing the salt content from 15 percent to 3 or 4 percent. It softens them considerably, changing the texture, a radically different article.

Q. After that steam treatment, and they are taken out, what happens then?—A. Then cooled, they are packed in glass jars, then covered with a special pickling liquor, which we call it, which is responsible for the final flavor of the pickle, and then hermetically sealed, washed, labeled, and packed and placed in the warehouse.

Q. Before selling the final commodity or article, you allow it to remain in the warehouse for a time?—A. Yes, it is necessary to retain it in the plant for at least a month, to allow the penetration of the fluid or liquor, which is responsible for its final flavor. Equalization must take place before it is finally sent out.

Another witness (a specialist in nut culture of the United States Department of Agriculture, called by the Government), states that the article, when further processed, "is used as a sauce for meats, converted into sort of a relish, used as a sauce for meats or mixture with salads to give it flavor."

There is no testimony in the record as to commercial designation of the imported articles, or as to the commercial meaning of the word "walnut." All the testimony on the subject of designation consists of the opinions of the witnesses as to the common meaning of the word "walnut", and this testimony is conflicting, the witnesses for the importer holding the view that immature walnuts are not walnuts, while those for the Government are of opinion that the opposite is the case.

We find nothing in the reports of the congressional committees which throws any light upon the meaning which was intended to be given to the language of said paragraph 760. Neither is there anything in the notes on tariff revision, furnished by the United States Tariff Commission to said committees, nor in the congressional debates on said bill, which has been called to our attention, which will aid the court. While the opinions of witnesses as to the common meaning to be attached to the word "walnut" is proper to be considered, and in some cases such testimony is given much weight,

still we think the usual rule is to consult standard lexicographers to determine the common meaning of statutory words. Webster's New International Dictionary (1932) thus defines the word "walnut":

walnut. 1. *a* The fruit or nut of any tree of the genus *Juglans*, esp. that of *J. regia*, commonly distinguished in the United States as the *English walnut*.

The brief of the importer, appellant, sets out definitions given by various other lexicographers, such as the Oxford Dictionary, Century Dictionary, and others, the definitions taken from these authorities being substantially the same as that given by Webster, above.

It is a matter of common knowledge, and it is shown by the record herein, that the fruit of the walnut tree consists of a kernel, a hull, and a husk, and that until the fruit is fully matured, the husk, in the form of a green, fleshy envelop, is adherent to the shell and that this shell remains more or less soft until the fruit is fully matured. From early times, in the history of our commerce, this entire fruit has been used as an article of importation and food, and, so far as the record shows, has been known and designated, when used in its green condition, as pickled walnuts.

The definition of the word "walnut", it will be observed, does not confine the meaning to the ripened and hardened shell containing the kernel, but extends to all parts of the fruit. It is common knowledge that one does not refer to; an immature apple as something other than an apple, nor would one refer to an immature walnut by any other name. In fact, if there be any other name which might be attached to a half or partially grown walnut, it has not been called to the attention of this court.

It follows, therefore, that if we are to classify an immature walnut with its husk attached as something other than a walnut, it must be because of some judicial construction or some administrative practice which has attached a different meaning to this stage of the fruit of the walnut tree.

Such a line of judicial construction, it is said, is afforded by certain adjudications of the courts under prior tariff acts. The first case which is called to our attention is *Acker* v. *United States*, T.D. 29036, 15 Treas. Dec. 532. This was a judgment of the United States Circuit Court of the Southern District of New York, in which Platt, District Judge, held, announcing his opinion orally, that the imported goods, pickled walnuts, were properly dutiable as unenumerated manufactured articles under section 6 of the Tariff Act of July 24, 1897. This act provided, in paragraph 270 thereof, for "walnuts of all kinds, not shelled, 3 cents per pound; shelled, 5 cents per pound". Paragraph 241 of said act provided, among other things, for "all vegetables, prepared or preserved, including pickles and sauces of all kinds". The collector classified the imported articles under said paragraph 241.

The importer claimed it to be dutiable as unshelled walnuts under said paragraph 270, or, alternatively, as an unenumerated manufactured article under said section 6. The circuit court held that the merchandise was dutiable under said section 6, remarking, in so doing, that there was no showing in the record that the commodity was "the walnut plucked green before the shell of the nut has formed", and further holding that the walnuts could not be regarded as vegetables.

This matter went to the United States Circuit Court of Appeals of the Second Circuit, and the decision was affirmed on the opinion of the district judge. *United States* v. *Acker, Merrill et al.*, 171 Fed. 77, T.D. 29925.

A consideration of this case discloses that it was not an adjudication upon any of the principles involved in the case at bar, nor were similar competing provisions involved.

In T.D. 23182, *In re Strohmeyer & Arpe Co.*, 19 Treas. Dec. 472, General Appraiser Waite, of the Board of General Appraisers, now the United States Customs Court, passed upon the dutiable status of pickled walnuts, under the Tariff Act of August 5, 1909. The goods involved in that case are stated by the general appraiser to be "walnuts in brine". Nothing further is said as to their condition. Paragraph 281 of said act had the same provisions as regards the classification of walnuts as was contained in the preceding act of 1897, heretofore quoted.

In addition, the act of 1909 contained paragraph 253, which provided, in part, for "pickles, including pickled nuts". The collector classified the imported goods under said paragraph 253. This classification was sustained by the Board. The particular claim of the importer is not stated.

Neither do we find in this decision anything that aids in the construction of the paragraphs now before us, or anything which might be held to be judicial interpretation, afterwards approved by a succeeding act of Congress. In preparing the Tariff Act of 1930, the Ways and Means Committee of the House included in the bill, H.R. 2667, new language in the paragraph relative to the classification of walnuts numbered in said act as paragraph 760, namely "blanched, roasted, prepared, or preserved, including walnut paste, 15 cents per pound." Here for the first time the Congress provided language in the walnut paragraph which exactly and specifically included the product here imported. In all preceding cases on the subject there had been no such provision. Walnuts, up until the time of the passage of the Tariff Act of 1930, to be classified as such, must be either shelled or unshelled. Consequently it was thought by courts passing upon the subject that other competing provisions applied to such importations, and decided the dutiability of pickled or preserved walnuts upon that basis only. None of the cases which have been

called to our attention are, we think, conclusive or even persuasive as to the dutiability of the articles imported here under the provisions of the Tariff Act of 1930.

Brine may be a method of preservation, as we said in *Sexton* v. *United States*, 22 C.C.P.A. (Customs) 211, T.D. 47140, decided concurrently herewith. The record here shows that the brine in which these imported walnuts were immersed had a 15 per centum component of salt, which was three times the ordinary salt content of sea water. It is not contended that this would not constitute a preservation of the imported articles. In fact, the record shows it was such a preservative of the samples retained in the case.

The testimony of the witness Kennedy is to the effect that the purpose of the brine was to "prevent the decomposition during transportation and storage." Under some of the authorities it might be said that this is insufficient to prove that the walnuts were prepared or preserved. It is shown by the record that some of the salt from the brine had penetrated the walnuts. This would constitute a certain degree of preservation. In addition, the trial court has made a finding that the imported walnuts are "pickled", which we assume is tantamount to a finding that they are prepared or preserved.

From our consideration of the record we arrive at the conclusion that the goods were properly classified by the collector. The judgment of the United States Customs Court is *reversed*.

### DISSENTING OPINION

GARRETT, Judge: I am of opinion that the text of paragraph 760, quoted in full in the majority opinion, was designed and intended solely to provide for mature walnuts and products therefrom, and mature pecans.

I am further of the opinion that if there be any doubt upon this question not resolvable by an examination of the text of the paragraph alone, the doctrine of legislative adoption of administrative practice and judicial decision clearly excludes the merchandise here at issue from classification under the said paragraph.

As is shown in the majority opinion, the 1897 tariff act made provision for "* * * walnuts of all kinds, not shelled * * * shelled." The 1909 act carried the same provision in the same language. The 1913 act did the same, as did the 1922 act.

So far as shown, there was never any proposal by the administrative officials to classify merchandise like this under the walnut provision of any one of those acts. The judicial decisions are recited in the majority opinion. If, for a period of more than 30 years, during which four different general tariff acts were in effect, this

merchandise was not walnuts for tariff purposes, it is a puzzle to me why it should become so now.

If I understand the majority opinion correctly, it holds that paragraph 760 covers it now because Congress inserted the words "blanched, roasted, prepared or preserved, including walnut paste."

Of course, the words "blanched" and "roasted" have no bearing upon the issue, nor does "walnut paste", since the merchandise is not described by any of those terms.

The matter then is left to turn upon the words "prepared or preserved." It seems most remarkable to me that the insertion of those words should be held to change the *per se* character of anything. What was intended was that the walnuts actually covered by the paragraph, if prepared or preserved, should fall within it. They were not designed to bring into the paragraph something which had never been "walnuts", in a tariff sense. Congress does not have to proceed in any such crude or roundabout manner to place an article where it intends it to be classified and I do not believe it did so with respect to this article.

I am really of the opinion that, upon the record before us, the merchandise should be classified as it was classified by the United States Circuit Court in the *Acker* case cited in the majority opinion—that is, as a nonenumerated manufactured article, but if not there, then it should be classified as found by the United States Customs Court.